FILED
**United States Court of Appeals**
**Tenth Circuit**

**July 9, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOSEPH ALLEN MALDONADO,

    Defendant - Appellant.

No. 23-6207
(D.C. No. 5:18-CR-00227-SLP-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT***
_____

Before **TYMKOVICH**, **BALDOCK**, and **EID**, Circuit Judges.
_____

This case is the fourth installment in a series of appeals involving Joseph

Maldonado—also known as "Joe Exotic" or the "Tiger King." Among other things,

Maldonado was convicted of two counts related to a murder-for-hire plot in which he

attempted to hire two hitmen to kill his rival, Carole Baskin, and five counts of

violating the Endangered Species Act for killing five of his own tigers. Following

his convictions, Maldonado filed a motion for a new trial based on newly discovered

---

  * After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

evidence purportedly showing that multiple witnesses recanted their trial testimony and that the government unlawfully concealed evidence related to witness immunity agreements and the tigers' health.

The district court denied Maldonado's motion, and this appeal followed. We hold that Maldonado has waived several of his arguments on appeal—specifically, Maldonado has waived his arguments that the district court applied the wrong standard to his motion and improperly disregarded some of his arguments as being overly conclusory, and that new evidence would support an entrapment defense. We also hold that the district court did not abuse its discretion or otherwise err by denying Maldonado's motion for a new trial. Accordingly, we affirm.

## I.

Joseph Maldonado rose to fame through his central role in the drama-documentary *Tiger King: Murder, Mayhem and Madness*, a Netflix series that chronicled Maldonado's experiences as a private zookeeper and tiger owner. *See United States v. Maldonado-Passage*, 56 F.4th 830, 836 (10th Cir. 2022). Maldonado—the so-called "Tiger King," who also goes by "Joe Exotic"—opened an exotic-animal zoo in Wynnewood, Oklahoma, which he owned and operated for decades. As his moniker would suggest, Maldonado eventually became known for owning and exhibiting big cats—tigers, mainly, in addition to lions and cross-bred hybrids.

Maldonado has been embroiled in a bitter, years-long feud with Carole Baskin, an animal-rights activist who is outspoken "against the abuse of big cats in

2

captivity." Aple. App'x Vol. II at 5.  As Maldonado's exotic-animal zoo rose to local fame, Baskin began to publicly condemn his practices, which she viewed as animal exploitation.  Baskin contacted malls where Maldonado was scheduled to perform road shows with his tiger cubs, trying to dissuade the malls from hosting him; when Maldonado did perform, Baskin and her supporters would attend in protest.  Baskin also publicly identified Maldonado on her advocacy website as someone she believed was exploiting animals.

Eventually, Maldonado responded by renaming his road shows so as to mimic Baskin's own organization name.  Baskin then successfully sued Maldonado for copyright and trademark infringement, obtaining a $1 million judgment against him. That judgment drove Maldonado into bankruptcy, and so he transferred ownership of his zoo to Jeff Lowe—another locally famous owner and purveyor of tigers—who left Maldonado in charge of the zoo's day-to-day operations.

From there, the rivalry between Maldonado and Baskin escalated quickly. Irate at what he perceived as an attempt to drive him out of business, Maldonado began telling zoo employees that he would like to see Baskin dead.  He spoke daily about wanting to have Baskin murdered, and he repeatedly tried to recruit people to kill her.  Eventually, Maldonado found a potential hitman:  zoo employee Allen Glover.

According to Glover, Maldonado first spoke with him about a potential murder-for-hire plot around October 2017.  Maldonado offered to pay Glover $5,000 if he would kill Baskin, and the two men continually discussed different ways it

could be done.  About a month later, in early November 2017, Maldonado arranged for Glover to travel to Texas to get a fake ID so that Glover could travel to Florida, where Baskin lived, without revealing his identity.  Maldonado asked another man, John Finlay, to accompany Glover, paying Finlay for the cost of the gas to get to Texas and for the cost of the fake ID.

Before Glover left for Florida, Maldonado gave him an envelope stuffed with cash as his payment.  Maldonado also took Glover's phone and shipped it overnight to Las Vegas, where Lowe received the phone and used it occasionally so that the phone's location would register there and cover up Glover's true location.  Meanwhile, Maldonado had Glover buy a throwaway (or "burner") phone, which contained pictures of Baskin so that Glover "wouldn't kill the wrong person." *Id.* at 97–98.

For nearly two weeks, Glover delayed going to Florida.  Eventually, though, he flew from Oklahoma to Savannah, Georgia, intending to stop in South Carolina before going to Florida to kill Baskin.  Glover traveled to Florida a few weeks later, but he never followed through on the murder plan—instead, he wound up on a beach drunk and high, having spent all of the money Maldonado had paid him, and he then went back to South Carolina.

Left without a hitman, Maldonado started looking elsewhere.  Maldonado discussed his options with his friend and fellow tiger owner, James Garretson—who, by that point, had long been involved in Maldonado's conversations about killing Baskin.  In fact, around the time that Maldonado first hired Glover as his original

4

hitman, Maldonado spoke with Garretson about his plans to have Baskin killed. And in the months following, Maldonado continued to tell Garretson about the murder-for-hire plot, divulging to Garretson the details of his plans with Glover and, eventually, his need for a new hitman.

Unbeknownst to Maldonado, however, Garretson had become a government informant. Months earlier—after Maldonado first shared with Garretson his detailed plans to have Baskin killed—Garretson received a call from Agent Matthew Bryant, who worked for the U.S. Fish & Wildlife Service. In September 2017, Garretson met with Agent Bryant, admitted that he had heard Maldonado discuss plans to hire a hitman to kill Baskin, and agreed to become an informant in the government's investigation of Maldonado. Garretson agreed to record phone calls and in-person conversations with Maldonado, as well as conversations with Lowe, Glover, and "anybody else [he] encountered [who] seemed to have knowledge" about Maldonado's plot. *Id.* at 45–56. Garretson turned over these phone calls, along with several text messages, to the government.

For months, Garretson recorded conversations in which Maldonado explicitly described his desire to kill Baskin and the plans he was putting in place to do so. After Maldonado hired Glover as his hitman, Garretson also recorded conversations with Glover, in which Garretson asked Glover about his plans to carry out the murder. During those conversations, Glover repeatedly insisted that he was actually going to kill Baskin—although Glover later claimed he never intended to actually

5

follow through with the plan but wanted to convince Garretson otherwise so that Garretson would not take his place and take the money.

Eventually, when Glover delayed going to Florida, Garretson thought the murder-for-hire plot had been called off. Knowing that Maldonado viewed Glover as untrustworthy, Garretson began suggesting to Maldonado—at the government's direction—that Maldonado hire another hitman, whom Garretson had mentioned before as someone he knew. Maldonado expressed interest, asking "[h]ow much that dude [would] cost" and offering to give Garretson cash to pay his hitman. Aple. App'x Vol. I at 150–52.

That other hitman, it turned out, was an undercover FBI agent, referred to at trial as Special Agent Mark Williams. In December 2017, once Glover had abandoned his plans to kill Baskin, Garretson arranged for Maldonado to meet with Special Agent Williams as a new potential hitman. Maldonado gave Special Agent Williams several documents related to Baskin, which he claimed to have stolen from Baskin's office. Maldonado and Special Agent Williams concocted a plan for him to kill Baskin by following her into a parking lot, shooting her, and driving off.

Throughout the following months, Garretson continued recording conversations with Maldonado in which they discussed the plan to use Special Agent Williams as a hitman. Maldonado expressed some reservations, asking Garretson if they could trust Special Agent Williams.

Then, around March 2018, Maldonado cut off communication with Garretson. Garretson testified that he did not know why Maldonado stopped talking with him,

6

but that it was around the same time that Lowe had come back to Oklahoma from Las Vegas. Garretson then had a conversation with Lowe that led him to believe Lowe knew about Glover's involvement in the murder-for-hire plot. Garretson relayed that information to Agent Bryant and coordinated a meeting between him, Lowe, and Lowe's wife, Lauren, where the Lowes handed over Glover's personal phone that had been mailed to them in Las Vegas. After that, Garretson's involvement in the investigation ended.

In September 2018, a grand jury in the Western District of Oklahoma returned an indictment that charged Maldonado with two counts of using a facility of interstate commerce in the commission of a murder-for-hire plot, in violation of 18 U.S.C. § 1958(a). The two counts arose out of the two separate plots involving Glover and Special Agent Williams.

Months later, the grand jury returned a superseding indictment, adding several charges. As relevant here, Maldonado was charged with five additional counts for violations of the Endangered Species Act, 16 U.S.C. § 1538(a)(1)(F), based on Maldonado's shooting and killing of five tigers. Specifically, as Maldonado later testified, he decided to kill several tigers at his zoo one day after coming to realize he had "all these crippled animals" that he was "making suffer to be on display to suck donations out of people." Supp. Aple. App'x at 110–11. Maldonado therefore shot the five tigers, believing that doing so was better than following the euthanasia protocol he had established with his park veterinarian because it was cheaper and faster.

After trial, a jury convicted Maldonado on all counts.  Maldonado was sentenced to 264 months' imprisonment; he later successfully appealed that sentence in this Court,[1] was then resentenced to 252 months' imprisonment, and unsuccessfully appealed that resentencing.[2]  Two years after his conviction, and while his second appeal was pending, Maldonado filed a motion for a new trial.[3]  In part, Maldonado's motion sought a new trial as to the two counts involving the murder-for-hire plot based on purportedly new evidence, which allegedly indicated that several witnesses—Glover, Garretson, and Jeff and Lauren Lowe—had lied during their trial testimony, recanted their testimony, or received offers of immunity in exchange for their testimony against Maldonado.  Maldonado also sought a new trial as to the five counts related to the killing of his tigers, relying on evidence that Maldonado claims was uncovered after trial and that allegedly proved the tigers were ill at the time he killed them.

The district court denied Maldonado's motion.  In its reasoning, the district court concluded that Maldonado's purportedly new evidence was insufficient to satisfy the requirements for a new trial, especially because the other evidence at

---

[1] *See United States v. Maldonado-Passage*, 4 F.4th 1097 (10th Cir. 2021).

[2] *See United States v. Maldonado-Passage*, 56 F.4th 830 (10th Cir. 2022).

[3] In the meantime, Maldonado also filed a third appeal in this Court, which entailed a habeas corpus proceeding challenging the denial of a motion Maldonado filed pursuant to 28 U.S.C. § 2255.  *See United States v. Maldonado*, 2024 WL 5244829 (10th Cir. Dec. 30, 2024).  The panel in that case denied a certificate of appealability and dismissed the matter.  *Id.* at *5.

trial—including Maldonado's own testimony—provided "strong, credible evidence" of his guilt. Aplt. App'x at 240.

Maldonado appealed, arguing that the district court committed a number of errors in denying his motion for a new trial. Specifically, Maldonado argues that the district court (1) applied the wrong legal standard; (2) improperly disregarded some of his arguments as being overly conclusory; (3) improperly refused to hold an evidentiary hearing regarding the witnesses who allegedly lied during their testimony; (4) improperly denied his motion with respect to the counts involving the death of the tigers; (5) improperly rejected Maldonado's claims that the government failed to disclose immunity agreements with witnesses in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972); and (6) should have granted a new trial based on a putative entrapment defense. We address each set of claims in turn.

## II.

Before turning to the substance of Maldonado's claims, we first briefly describe the substantive standard for a motion for a new trial, and we set out the standards of review applicable to the denial of such a motion.

Following a guilty verdict, a criminal defendant may move the district court to vacate the judgment of conviction and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). But we have previously expressed that "[a] motion for a new trial is not viewed with favor and should be treated with great

9

caution." *United States v. Chatman*, 994 F.2d 1510, 1518 (10th Cir. 1993); *see United States v. Perea*, 458 F.2d 535, 536 (10th Cir. 1972).

Where, as here, a motion for a new trial is based upon newly discovered evidence, the defendant must show that:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*United States v. Jackson*, 579 F.2d 553, 557 (10th Cir. 1978); *see Chatman*, 994 F.2d at 1518. The burden of satisfying each of those requirements rests at all times with the defendant. *See United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997).

Ordinarily, "[t]he denial of a motion for a new trial based on newly discovered evidence is reviewed for abuse of discretion." *United States v. McCullough*, 457 F.3d 1150, 1167 (10th Cir. 2006). An abuse of discretion occurs if the district court's decision is "arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Herrera*, 481 F.3d 1266, 1270 (10th Cir. 2007) (quotation omitted). Additionally, "a district court necessarily abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law." *Johnson v. Spencer*, 950 F.3d 680, 701 (10th Cir. 2020) (cleaned up). And "even in the context of the deferential abuse-of-discretion standard, we review subsidiary legal questions de novo." *Id.*

As with our review of the denial of a motion for a new trial based on newly discovered evidence, we likewise review the denial of an evidentiary hearing in relation to a motion for a new trial (based on evidence of a witness's perjury or

10

recantation of testimony) for abuse of discretion. *See Chatman*, 994 F.2d at 1518–19. But we review de novo the denial of a motion for a new trial based on a *Brady* or *Giglio* violation. *United States v. Cordova*, 25 F.4th 817, 826 (10th Cir. 2022).

## III.

With those standards in mind, we begin with Maldonado's argument that the district court applied the incorrect legal standard in reviewing Maldonado's motion for a new trial based on newly discovered evidence that witnesses purportedly committed perjury or recanted their testimony after trial. Maldonado argues that the district court improperly applied a five-part test for evaluating such motions derived from *Berry v. Georgia*, 10 Ga. 511 (1851), which requires, among other things, a reasonable probability that the new evidence would have changed the jury's verdict. *See Sinclair*, 109 F.3d at 1531–32. Maldonado claims that our Circuit has never adopted the *Berry* test and insists that the district court should have instead applied a more lenient test requiring only a *possibility* that the jury would have reached a different verdict without considering the perjured or recanted testimony. *See Larrison v. United States*, 24 F.2d 82, 87 (7th Cir. 1928).

We conclude that Maldonado has waived this argument under the invited-error doctrine. Under the invited-error doctrine, we deem an issue waived and decline to review it—for plain error or otherwise—if a party "urged the district court to adopt" the very proposition that the party attacks on appeal. *United States v. McBride*, 94 F.4th 1036, 1042 (10th Cir. 2024) (quoting *United States v. DeBerry*, 430 F.3d 1294, 1302 (10th Cir. 2005)). In other words, "if a party affirmatively invites the

district court to take a certain action," then "we construe the party to have 'knowingly and intelligently relinquished' any claim of error; that is, we deem such a claim waived." *Id.* at 1051 (Eid, J., concurring in part and concurring in the judgment) (quotation omitted).[4]

At the district court, Maldonado not only failed to argue that the *Berry* test does not apply in our Circuit, but he also in fact invited the court to use that test as the governing standard. Indeed, Maldonado's motion for a new trial clearly set forth the five-part *Berry* standard—including its probability requirement—as the governing legal standard to use in evaluating a motion for a new trial.[5] But now, on appeal, Maldonado instead claims that the *Berry* standard should not apply after all. The invited-error doctrine prohibits Maldonado from changing course in this way. Because Maldonado "urged the district court to adopt" the very position he now attacks on appeal, he has waived this argument. *Id.* at 1042 (quoting *DeBerry,*

---

[4] Our Circuit has recognized an exception to the invited-error doctrine, called the "supervening-decision exception," which generally applies when (1) "the law of the Tenth Circuit was previously so well-settled it foreclosed any possibility of success" and (2) "the relevant law in this Circuit was changed by an intervening Supreme Court or Tenth Circuit decision." *McBride,* 94 F.4th at 1052 (Eid, J., concurring in part and concurring in the judgment). That exception does not apply here because Maldonado does "not argue on appeal that the law in this Circuit was settled." *Id.* To the contrary, Maldonado expressly argues that our Circuit's legal standards for analyzing a motion for a new trial are "unsettled." Supp. Aplt. Br. at 29.

[5] Although Maldonado's motion for a new trial did not explicitly cite *Berry,* the five-part standard he sets forth in his motion is identical to and ultimately derived from *Berry.* *See United States v. Stevens,* 978 F.2d 565, 570 (10th Cir. 1992); *see also United States v. Ramsey,* 726 F.2d 601, 605 & n.2 (10th Cir. 1985) (adopting *Berry* test and setting forth its five requirements).

12

430 F.3d at 130). We therefore deem Maldonado's argument waived and decline to address it.

**IV.**

Next, we address Maldonado's argument that the district court abused its discretion by disregarding some of the arguments Maldonado made in support of his motion for a new trial on the grounds that those arguments were too conclusory. In denying Maldonado's motion, the district court concluded that several of Maldonado's arguments were "too vague and conclusory for [it] to meaningfully analyze" because they lacked citations to any particular exhibits, portions of the trial record, or legal standards, and so the court stated that it would "consider *only* the arguments [actually] identified and presented in the briefing." Aplt. App'x at 174. On appeal, Maldonado challenges the district court's refusal to consider his arguments in more detail, seemingly arguing that the district court mischaracterized or exaggerated the conclusory nature of his arguments below.

We decline to reach the merits of this argument as well, but for a different reason than above: we conclude that Maldonado has waived this argument through inadequate briefing. Specifically, Maldonado's supplemental opening brief—where this issue is raised for the first time—states that the district court "erroneously construed" the "massive weight" of his evidence "as 'buried truffles.'" Supp. Aplt. Br. at 33. But nowhere in his brief does Maldonado actually identify or specify the district court's purported error. In fact, in the two-page section of Maldonado's brief dedicated to this argument, Maldonado extensively quotes from the district court's

order and describes the district court's reason for deeming his arguments conclusory. But Maldonado does not explain how the district court's reasoning could constitute an abuse of discretion, nor does he cite any cases or other authority to support that position. Instead, he supplies only one example of an exhibit that he referenced in his motion at the district court; he otherwise makes no attempt to support his conclusory assertion that his "citation strings of exhibits" in his motion were sufficiently detailed because they were "proffers of the *sheer weight* of newly discovered evidence." *Id.* at 34.

Maldonado's briefing on this issue does not satisfy the requirements of the Federal Rules of Appellate Procedure, which specify that an argument section must "contain the appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." *MacArthur v. San Juan County*, 495 F.3d 1157, 1160 (10th Cir. 2007) (quoting Fed. R. App. P. 28(a)); *see Defs. of Wildlife v. U.S. Forest Serv.*, 94 F.4th 1210, 1227 n.10 (10th Cir. 2024). And without any citations to the record or to legal authorities, and without any meaningful explanation of his position, Maldonado's briefing fails to facilitate appellate review because it does not provide the government, nor us, a meaningful way to respond to his arguments.

In the face of inadequate briefing that fails to abide by the rules of appellate procedure, our Court may exercise discretion to dismiss the appeal, decline to address the issue, or proceed to the merits regardless. *MacArthur*, 495 F.3d at 1161. Because

14

Maldonado provides no meaningful argument or authority in support of his claim, we decline to address the issue and deem it waived.

## V.

We next consider Maldonado's argument that the district court abused its discretion by declining to hold an evidentiary hearing before ruling on Maldonado's motion for a new trial. Specifically, and with respect to the portion of his motion based on the purported post-trial recantations of three witnesses, Maldonado argues that the district court should have held an evidentiary hearing before ruling on his motion in order to evaluate the credibility and impact of the witnesses' recantations.

## A.

When a motion for a new trial is based on newly discovered evidence that a trial witness committed perjury or later recanted their testimony, a court may only grant the motion if it is "satisfied that the challenged testimony was actually false." *United States v. Bradshaw*, 787 F.2d 1385, 1391 (10th Cir. 1986). That is so because "recanted testimony is properly viewed with suspicion." *United States v. Ramsey*, 726 F.2d 601, 605 (10th Cir. 1985).

To determine whether the challenged testimony is actually false, "the trial court ordinarily must conduct an evidentiary hearing to evaluate both the credibility and impact of a recantation." *United States v. Page*, 828 F.2d 1476, 1478 (10th Cir. 1987); *United States v. Pearson*, 203 F.3d 1243, 1274 (10th Cir. 2000) ("We ordinarily require an evidentiary hearing so that the trial court may determine the credibility of the recantation and place its findings in the record to give the reviewing

15

court 'some basis for evaluating its conclusion.'" (quoting *Ramsey*, 726 F.2d at 605)). Although "[t]he determination of a witness's credibility is a matter for the trial court rather than the appellate court," we nevertheless "must be able to 'discern from the record whether or how the trial judge evaluated the credibility of [a witness's] recantation.'" *Chatman*, 994 F.2d at 1518 (quoting *Ramsey*, 726 F.2d at 605).

Nevertheless, an evidentiary hearing is not always required; "in some instances, the trial judge may be able to assess the credibility of the recantation without holding such a hearing." *Pearson*, 203 F.3d at 1274; *see Chatman*, 994 F.2d at 1519 (affirming denial of a motion for a new trial "even absent an evidentiary hearing" where "the record [was] adequate . . . to discern that the district court evaluated the credibility" of a witness's recantation). Thus, if the record is sufficient for the district court to independently determine the credibility of a witness's recantation, then the refusal to hold an evidentiary hearing is not an abuse of discretion. *Pearson*, 203 F.3d at 1275.

To that end, we have generally reversed a district court's refusal to hold an evidentiary hearing only where a district court fails to make any express findings of fact related to witness credibility. *See Ramsey*, 726 F.2d at 604. By contrast, we have affirmed the refusal to hold an evidentiary hearing where a witness's recantation of trial testimony is not made under oath or in a sworn affidavit. *Pearson*, 203 F.3d at 1275 (observing that "[s]worn trial testimony is generally not refuted by unsworn repudiation of that testimony"); *Bradshaw*, 787 F.2d at 1392 (affirming refusal to hold evidentiary hearing where district court found a recantation not credible because

16

the witness "never stated under oath that his trial testimony was false" and where related affidavits were conflicting).

Likewise, we have affirmed the refusal to hold an evidentiary hearing where the court "had several opportunities to assess the credibility" of the witness's challenged testimony, *Pearson*, 203 F.3d at 1275, including where "the district court judge who denied the motion for new trial was the same judge who presided over [the] trial" and where "other trial witnesses, also observed personally by the district judge, corroborated [the witness's] original trial testimony (and thus undercut his recantation)," *United States v. Jones*, 315 F. App'x 714, 716 (10th Cir. 2009) (Gorsuch, J.).

**B.**

Maldonado's argument regarding the denial of an evidentiary hearing focuses primarily on three purported post-trial recantations:  (1) Glover's recantation of his statement at trial that he had not been offered immunity; (2) Garretson's recantation of his statement at trial that he had not been offered immunity; and (3) Lauren Lowe's post-trial affidavit stating that she could "not say for certain" whether her trial testimony was accurate.  *See* Supp. Aplt. Br. at 34–40.  We address each witness in turn.

First, Maldonado argues that he was entitled to an evidentiary hearing on his new-trial motion because Glover—Maldonado's first (and failed) hitman—recanted his trial testimony that the government had not offered or given him immunity from future prosecution.  After trial, Glover backtracked on that claim, stating in an

17

affidavit that Agent Bryant "told [him] during trial prep that if [he] did what they asked[,] no charges would be brought against [him] now or in the future." Aplt. App'x at 158. And Maldonado claims, in turn, that because Glover eventually stated that he *had* in fact been offered immunity, but his immunity deal had not been disclosed at trial, then a *Giglio* violation occurred.

The district court found that Glover's purported recantation was not credible. Specifically, the district court discredited Glover's affidavit "based on other evidence in the record" that either corroborated Glover's original trial testimony or conflicted with or undermined Glover's recantation, or both. *Id.* at 221–22. For instance, the district court cited a "competing affidavit" submitted by Agent Bryant, in which Agent Bryant denied that any immunity or promise of immunity was offered to Glover. *Id.* The district court also cited a phone call between the Lowes and Agent Bryant, in which Agent Bryant made comments about Glover that suggested Glover "still feared prosecution" and could get in "trouble." *Id.* at 222. Additionally, the court cited evidence from the trial itself—including Glover's own testimony, as well as evidence that Glover never intended to kill Baskin and could not be convicted of the murder-for-hire plot—which, the court found, made it unlikely that Glover would have needed an offer of immunity at all.

The district court was entitled to rely on and weigh the conflicting affidavits and other trial evidence without the need for an evidentiary hearing. *Bradshaw*, 787 F.2d at 1392. And because all of that evidence provided the district court with "several opportunities to assess the credibility" of Glover's trial testimony and

recantation, the district court was within its discretion to find that Glover's

recantation was not credible—even without an evidentiary hearing. *See Jones*,

315 F. App'x at 716 (Gorsuch, J.).

Similarly, Maldonado argues that he was entitled to an evidentiary hearing

because Garretson, Maldonado's ex-friend who became a government informant,

likewise recanted his trial testimony that the government had not offered or given

him immunity from future prosecution.[6]  But as with Glover, the district court did not

abuse its discretion in finding that Garretson's purported recantation was not

credible, even without an evidentiary hearing.  As the district court noted, Garretson

testified at trial that he did not receive immunity, and he denied having received any

offer of immunity agreement in five other instances.  The only instance in which he

purportedly recanted that statement was in a post-conviction interview—not a sworn

affidavit.  Thus, the district court was within its discretion to reject Garretson's

purported recantation without an evidentiary hearing.  *See Pearson*, 203 F.3d at 1275

(observing that "[s]worn trial testimony is generally not refuted by unsworn

repudiation of that testimony"); *Bradshaw*, 787 F.2d at 1392 (affirming refusal to

---

[6] Maldonado's argument with respect to Garretson is likely inadequately briefed.  Maldonado's discussion of Garretson's purported recantation does not cite to any part of the appellate record, and he makes only a handful of conclusory assertions, such as that the district court "had a duty to preserve the integrity of the justice system" and that "Maldonado's newly discovered facts were sufficient to trigger a new trial in any jurisdiction in the United States."  Supp. Aplt. Br. at 38.  In any event, because Maldonado's argument is sufficient for us to conclude that it is meritless, we exercise our discretion to address it.

19

hold evidentiary hearing where district court found a recantation not credible because the witness "never stated under oath that his trial testimony was false").

Finally, Maldonado argues that he was entitled to an evidentiary hearing with respect to Lauren Lowe's post-trial affidavit, in which she stated that she did not remember whether Maldonado had sent her and Jeff Lowe a package containing Glover's personal phone. According to Maldonado, that statement constituted a recantation of Lowe's earlier trial testimony that she and Jeff Lowe had received a package containing Glover's phone—a statement that was used as evidence of Maldonado's original murder-for-hire plot. Maldonado claims that Lowe's recantation was credible because it was "corroborated by physical evidence," including postal records showing that the package weighed almost five pounds (which, Maldonado claims, shows that the package could not have contained a cell phone). Supp. Aplt. Br. at 40.

Maldonado fails, however, to explain how the two statements necessarily constitute a recantation. Instead, as the district court observed, Lowe's "contention that she cannot *now*" remember whether she received Glover's phone "does not actually conflict with her trial testimony." Aplt. App'x at 191. Moreover, the district court found that Lowe's testimony was credible because it was bolstered by Maldonado's own trial testimony, in which he stated that there were plans to mail Glover's phone to the Lowes.

Altogether, then, the district court properly based its credibility determinations on the facts in the record, so its refusal to hold an evidentiary hearing was not an

abuse of discretion. We therefore affirm the district court's denial of an evidentiary hearing with respect to Maldonado's motion for a new trial.

## VI.

Maldonado next argues that the district court abused its discretion by denying his motion for a new trial specifically as to the counts involving his taking and killing of five tigers in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1538(a)(1)(B), 1540(b)(1). Maldonado argues that he was entitled to a new trial on those counts because newly discovered evidence purportedly shows both that he only killed the tigers because they were sick, and that the prosecution deliberately and unlawfully concealed evidence of the tigers' ill health.

## A.

Because Maldonado's argument turns on the substantive requirements of the ESA, we begin by briefly describing those requirements and addressing, as a threshold matter, whether Maldonado's conduct falls within the scope of the ESA.

The ESA makes it unlawful for any person to, among other things, "take" any "endangered species of fish or wildlife" within the United States. 16 U.S.C. § 1538(a)(1)(B). All species and subspecies of tigers have been deemed "endangered" under the ESA. *See* 50 C.F.R. § 17.11. Thus, the ESA protects tigers of all kinds—whether they are born in the wild or in captivity, and whether they are purebred or a cross-bred hybrid. *See* 81 Fed. Reg. 19923, 19923 (Apr. 6, 2016); 16 U.S.C. § 1538(b)(1).

21

The term "take," as it is used in the ESA, includes "harm[ing]," "shoot[ing]," and "kill[ing]."  16 U.S.C. § 1532(19).  Nevertheless, the ESA provides an exception under which a "taking" may be permissible if it is done "to enhance the propagation or survival of the affected species," subject to certain regulations.  *Id.* § 1539(a)(1)(A).  One such regulation provides that certain actions that would otherwise constitute a taking may still be permissible under the ESA, so long as the action "enhance[s] the propagation or survival" of the species.  50 C.F.R. § 17.3.  In particular, the regulation lists the "[p]rovision of healthcare" to a protected species, including by euthanasia, as a permissible action.  *Id.*

In explaining how the evidence of his tigers' ill health is relevant to his new-trial motion, Maldonado asserts that he could only be convicted of killing the five tigers if the government proved that he "violated actual, written, regulations or protocols in euthanizing his exotic animals," which would require that "the five tigers were healthy" when they were killed.  Supp. Aplt. Br. at 41.  But the ESA requires neither of those things.  As explained, Maldonado could be convicted of violating the ESA based on proof that he killed the tigers, *unless* he killed them by euthanasia as part of the "[p]rovision of healthcare."  50 C.F.R. § 17.3; 16 U.S.C. § 1539(a)(1)(A).  In other words, if Maldonado's act of shooting the tigers constituted the "[p]rovision of healthcare," then his conduct would fall outside of the ESA; meanwhile, if Maldonado was *not* "providing healthcare" to the tigers, then his conduct is punishable under the ESA.  50 C.F.R. § 17.3.

Maldonado's own trial testimony establishes that he did not shoot and kill the tigers in order to "provide" them healthcare. Maldonado does not dispute that he shot the five tigers, and he testified that he did so solely because it was cheaper and faster than having his park-affiliated veterinarian administer euthanasia. Moreover, Maldonado admitted at trial that he "violate[d] [the] protocol" that he had developed with the park veterinarian pursuant to USDA regulations, which required the veterinarian to euthanize any animal that needed it. Supp. Aple. App'x at 113–14.[7] Thus, Maldonado's conduct falls within the scope of the ESA.

**B.**

Having determined that Maldonado's conduct falls within the scope of the ESA, we now address the substance of his arguments regarding his convictions on the counts for killing five tigers under the ESA. As explained, Maldonado argues that he is entitled to a new trial because newly discovered evidence purportedly shows that he only killed the tigers due to their ill health, and that the prosecution deliberately and unlawfully concealed evidence of the tigers' health issues. In support of this argument, Maldonado relies principally on two pieces of evidence: (1) an affidavit from John Reinke, a former park manager at the zoo, who stated that the tigers were

---

[7] Maldonado also suggests that his conduct falls outside of the ESA because the statute "was never intended to apply to zoo animals." Supp. Aplt. Br. at 40 & n.6. But Maldonado cites no legal authority to support that proposition, relying instead only on his own trial testimony opining on the scope of the ESA. Regardless, his argument is meritless: the ESA has expressly been made applicable to animals bred, born, or held in captivity. *See* 81 Fed. Reg. 19923, 19923 (Apr. 6, 2016); 16 U.S.C. § 1538(b)(1).

sick, old, and suffering from arthritis, and that Maldonado shot them because it was a quicker, more humane way to euthanize them; and (2) an excavation and autopsy of the tigers' skulls, but not their bodies, which was conducted as part of the government's investigation.[8]

Maldonado first argues that Reinke's affidavit constitutes newly discovered evidence entitling him to a new trial, because—he claims—it demonstrates that Maldonado's killing of the five tigers was a form of humane euthanization "authorized by the USDA" because the tigers were sick. Supp. Aplt. Br. at 42–43. But that argument fails for the simple reason that the purportedly newly discovered evidence contained in Reinke's affidavit was not newly discovered at all. As the district court noted, Maldonado's trial counsel interviewed Reinke before trial—and so, at that point, Maldonado could have discovered any of the facts that Reinke later testified to in his affidavit.

The fact that Maldonado could have discovered the facts contained in Reinke's affidavit before trial is fatal to Maldonado's claim. To prevail on a motion for a new

---

[8] Maldonado also seems to rely on a conversation between Jeff Lowe and Agent Bryant, in which Bryant allegedly admitted that the prosecution joined the murder-for-hire counts against Maldonado with the counts related to the tiger killings in order to "get some jurors' heartstrings bleeding." Supp. Aplt. Br. at 42. Maldonado claims this evidence shows that "the government brought the tiger-killing charges against Maldonado solely to smear Maldonado in the jury's eyes—so that the jury would overlook the weakness of the murder-for-hire case." *Id.* But even if that were true, nothing indicates that the evidence of this conversation was in fact newly discovered after trial—nor does Maldonado argue that it was. Moreover, Maldonado has made no effort to explain how these statements—which bear only on the prosecution's litigation strategy—would be material to the tiger-killing charges or would probably result in an acquittal.

24

trial that is based upon newly discovered evidence, a defendant must show, among other things, that "the evidence was discovered after trial" and that "the failure to learn of the evidence was not caused by [the defendant's] own lack of diligence." *Jackson*, 579 F.2d at 557.  In other words, the evidence itself must actually be *new*—that is, the substance of the evidence must not have been known to the defendant before trial commenced.  *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999); *United States v. Leyba*, 504 F.2d 441, 442–43 (10th Cir. 1974) ("It is too well settled for discussion that a new trial is not warranted by evidence which, with reasonable diligence, could have been discovered and produced at the trial.").

Nowhere in his motion for a new trial did Maldonado explain why he could not have learned the substance of Reinke's claims sooner—nor does he attempt to do so in his argument on appeal.  In effect, then, Maldonado's reliance on Reinke's affidavit is nothing more than an attempt to "keep an evidentiary trump card" to set aside his conviction.  *Quintanilla*, 193 F.3d at 1148.  That he cannot do.  Even if Reinke's affidavit could show that Maldonado killed the tigers in a merciful effort to euthanize them (a claim that itself is dubious, given that Maldonado shot the tigers), it would still not satisfy the requirements for a motion for a new trial, because Reinke's testimony is evidence that Maldonado, "with reasonable diligence, could have [ ] discovered and produced at the trial." *Leyba*, 504 F.2d at 442–43.

Relatedly, Maldonado also claims that he is entitled to a new trial because the prosecution unlawfully concealed the physical evidence of the tigers' bodies in violation of *Brady*, an argument that we have treated as "a subspecies of [a] newly

25

discovered evidence claim." *Quintanilla*, 193 F.3d at 1148 n.9. A *Brady* violation can constitute grounds for a new trial where "the *Brady* materials were in the government's possession, and unknown to [the] defendant at the time of trial." *Id.*

To prevail on a motion for a new trial based on an alleged *Brady* violation, the defendant "must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *United States v. Torres*, 569 F.3d 1277, 1281 (10th Cir. 2009) (quotation omitted). Like the ordinary new-trial standard, materiality for *Brady* purposes requires "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *United States v. Cordova*, 25 F.4th 817, 826 (10th Cir. 2022) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)). The materiality of withheld evidence is evaluated "in light of the entire record in order to determine if 'the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *Fontenot v. Crow*, 4 F.4th 982, 1080 (10th Cir. 2021) (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)); *see also Kyles v. Whitley*, 514 U.S. 419, 435 (1995) ("One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

To support his *Brady* argument, Maldonado attempts to link the statements in Reinke's affidavit (which suggested that Maldonado only killed the tigers because they were sick) to the fact that the government excavated and examined only the

26

tigers' heads—and not their bodies. According to Maldonado, Reinke's statements negated the prosecution's theory at trial that Maldonado wanted to kill the tigers because they were not profitable. And because the prosecution did not perform an autopsy on the tigers' bodies, Maldonado had no way to prove, as part of his defense, that the tigers were actually sick. The prosecution's failure to perform an autopsy, Maldonado claims, therefore must have been an attempt to deliberately conceal evidence, and its suppression of that evidence must have been material under *Brady*, because the evidence would have revealed that Maldonado only killed the tigers because they were ill.

There are several problems with Maldonado's argument. First, as the government points out, Maldonado's motion for a new trial did not attempt to make this same link between Reinke's affidavit and the government's failure to examine the tigers' bodies. Instead, Maldonado's motion simply claimed that recovering the tigers' bodies would reveal evidence of infirmity or illness, without explaining *how* it would do so. In other words, Maldonado used Reinke's affidavit only as a source of newly discovered evidence—not as a basis for a *Brady* violation.

Additionally, even if Reinke's affidavit or the recovery of the tigers' bodies would show that the tigers were sick, Maldonado has failed to explain how that fact would be material or would create a probability of a different outcome. As explained, Maldonado admitted that he deliberately disregarded his veterinarian's long-established euthanasia protocol, which suggests that he was not "providing

healthcare" to the tigers within the meaning of 50 C.F.R. § 17.3—even if the tigers *were* healthy.

Thus, the district court was within its discretion to determine that neither Reinke's affidavit nor the government's failure to examine the tigers' bodies constituted a material *Brady* violation or newly discovered evidence sufficient to justify a new trial. We therefore affirm the district court's denial of Maldonado's motion for a new trial with respect to the five counts of killing tigers in violation of the ESA.

## VII.

Next, we address whether the district court erred by rejecting Maldonado's *Brady* and *Giglio* claims with respect to purported evidence that two witnesses received immunity for their testimony against Maldonado, a claim we review de novo. *Cordova*, 25 F.4th at 826.

As explained, a defendant may base a motion for a new trial on an alleged *Brady* violation as "a subspecies of [a] newly discovered evidence claim." *Quintanilla*, 193 F.3d at 1148 n.9. But unlike in the typical context of motions for a new trial, impeachment evidence (including immunity agreements) is considered exculpatory for *Brady* purposes. *See Giglio*, 405 U.S. at 154–55. Thus, when the government promises (whether explicitly or implicitly) a witness immunity from prosecution in exchange for their testimony, the government is required to disclose that promise to the defense. *Id.* Still, to show a *Brady* or *Giglio* violation, the defendant must prove by a preponderance of the evidence that an immunity

28

agreement actually existed. *See Douglas v. Workman*, 560 F.3d 1156, 1186 (10th Cir. 2009). Moreover, the defendant must still show that the immunity agreement was material and noncumulative. *See id.* at 1174.

With respect to this issue—which concerns Maldonado's conviction on the two murder-for-hire counts—Maldonado argues that the government unlawfully concealed evidence of immunity agreements with Glover and Garretson. First, Maldonado argues that Glover was implicitly offered immunity by way of "undisclosed favors" that would ensure he did not face prosecution for either a pending state-law DUI charge or for his involvement in the murder-for-hire plot. Supp. Aplt. Br. at 48–50. Because Glover was a key trial witness against Maldonado, Maldonado argues that the nondisclosure of this purported immunity agreement violated *Brady* and *Giglio*, thereby entitling Maldonado to a new trial.

As to Glover's purported immunity deal for the DUI charge, Maldonado asserts that "the government made pretrial phone calls (undisclosed to the defense) to influence local state prosecutors to deaden Glover's pending state DUI charge." *Id.* at 48. But Maldonado's assertion overlooks substantial portions of the record. Contrary to Maldonado's claim, other evidence in the record—including a sworn affidavit from Agent Bryant—indicates that the government did not ever call in favors to local prosecutors, and that the government never had a reason to offer Glover immunity because he pleaded nolo contendere to the DUI charge before Maldonado's trial even began. In light of this evidence—and especially when considering the district court's factual determinations with respect to Glover's own

29

credibility—the district court did not err in concluding that Maldonado failed to show that Glover received an undisclosed immunity deal that violated *Brady* or *Giglio*.

Next, with respect to Glover's purported immunity deal for his involvement in the murder-for-hire plot, Maldonado claims that the district court erred by "discount[ing]" the government's decision not to prosecute Glover. *Id.* at 49. Unlike the purported DUI immunity, the district court did not expressly determine that Maldonado failed to show the existence of an immunity agreement regarding Glover's role as a hitman; instead, the district court concluded that even if such an immunity agreement existed, Maldonado failed to show materiality.

On appeal, Maldonado fails to challenge the district court's materiality conclusion, seemingly arguing instead that the district court erroneously found that no immunity agreement existed. Moreover, Maldonado does not attempt to fit the alleged immunity agreement into the *Brady* or *Giglio* framework to show how such an agreement would be material to, or affect the outcome of, his trial. Maldonado has therefore failed to demonstrate that the district court erred by rejecting his *Brady* and *Giglio* arguments with respect to Glover.

Similarly, Maldonado argues that the prosecution unlawfully failed to disclose an immunity agreement purportedly offered to Garretson for a variety of offenses he was allegedly involved in. As mentioned, Garretson denied at trial—and in five other instances after trial—that he ever received an offer of immunity. But in one unsworn post-trial interview, Garretson stated that he had in fact received immunity. The district court found that Garretson's recantation was not credible because it was

an unsworn statement directly contradicting his trial testimony. And, as explained, that credibility determination was properly within the court's discretion. *See Pearson*, 203 F.3d at 1275 ("Sworn trial testimony is generally not refuted by unsworn repudiation of that testimony."). With that factual finding in mind, Maldonado has failed to show that Garretson actually received an offer of immunity in exchange for his testimony. Absent such evidence, Maldonado's *Brady* and *Giglio* claim with respect to Garretson likewise fails. *See Douglas*, 560 F.3d at 1174.[9]

Because Maldonado failed to show the existence of an immunity agreement with Garretson—and because evidence of any such agreement would have been cumulative at best—the district court did not err in rejecting Maldonado's *Brady* and *Giglio* arguments with respect to Garretson. Thus, we affirm the district court's conclusion that Maldonado failed to show violations of *Brady* and *Giglio* with respect to alleged immunity agreements offered to Glover and Garretson.

## VIII.

Finally, we address Maldonado's claim that he is entitled to a new trial based on an entrapment defense. Maldonado argues that the newly discovered evidence would have supported an entrapment defense at trial because the new evidence shows that he was not predisposed to harming either Baskin or his own tigers, and that his criminal conduct "was orchestrated by others[,] with [the] government as conductor."

---

[9] What's more, even if Garretson *had* received an immunity agreement, it would not satisfy the materiality requirement because the government's decision not to prosecute Garretson was presented to the jury at trial. Thus, any purported immunity agreement would have been cumulative. *See Douglas*, 560 F.3d at 1174.

Supp. Aplt. Br. at 63. But we decline to consider this argument because Maldonado failed to raise an entrapment defense at the district court and has failed to argue for plain error on appeal.

When a party fails to raise an argument below or otherwise preserve it for appeal, "we typically treat the argument as forfeited." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). We review a forfeited argument for plain error, which requires the party raising the argument to show "that (1) an error occurred; (2) the error was plain; (3) the error affected his substantive rights; and (4) the error seriously affects the fairness, integrity, or reputation of judicial proceedings." *McBride*, 94 F.4th at 1040. If a party fails to argue plain error on appeal, "we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *Leffler*, 942 F.3d at 1196.

At no point in the district court proceedings did Maldonado raise an entrapment defense. Indeed, a search through the record reveals that the only time the word "entrap" appears is in the transcript of a conversation (in which Maldonado was not even involved)—not in his motion for a new trial or in any other motion or proceeding. *See* Aplt. App'x at 141. Instead, Maldonado's defense at trial revolved around his argument that it was Lowe—not Maldonado—who concocted the plan to kill Baskin. Thus, because Maldonado failed to raise an entrapment defense (or anything remotely similar) before the district court, and because he has failed to

32

argue plain error on appeal, he has waived his entrapment argument. *See Leffler*, 942 F.3d at 1196.

## IX.

For the foregoing reasons, we AFFIRM.

Entered for the Court

Allison H. Eid
Circuit Judge