FILED
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**February 10, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ANTHONY CORDOVA,

    Defendant - Appellant.

No. 20-2007

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:16-CR-01613-JB-11)**
_____

Dain Smoland (Ann Marie Taliaferro with him on the briefs) of Smoland Law, Salt Lake City, Utah, for Defendant-Appellant.

Tiffany L. Walters, Assistant United States Attorney (Fred. J. Federici, Acting United States Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.
_____

Before **PHILLIPS**, **BALDOCK**, and **BRISCOE**, Circuit Judges.
_____

**PER CURIAM**
_____

In July 2018, a jury convicted Anthony Cordova of two felonies associated with the murder of Shane Dix: *(1)* committing a violent crime in aid of racketeering activity ("VICAR murder"), under 18 U.S.C. § 1959(a)(1)–(2), and *(2)* in the course

of that crime, causing the death of Dix through use or possession of a firearm, under 18 U.S.C. §§ 924(c), 924(j)(1).

In this appeal, Cordova challenges the district court's pretrial ruling denying his motion to exclude a mostly unintelligible one-minute recorded portion of a conversation with a cooperating witness. In addition, Cordova contends that the district court abused its discretion in denying his two motions for a new trial—one alleging insufficiency of evidence and government misconduct, and the other alleging newly discovered evidence. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

In 2015, law-enforcement officials uncovered a plot by members of the Syndicato de Nuevo Mexico gang ("SNM") to murder the New Mexico Secretary of Corrections and other public officials.[1] In response, a federal task force investigated those specific threats as well as some unresolved homicides with suspected SNM ties. One such homicide was that of Shane Dix—a member of a rival Albuquerque street gang. In 2005, Dix was shot to death as he sat inside his van.

The investigation led law enforcement to Cordova. After much work, including an unscheduled interview of Cordova at his welding class, the government obtained a federal indictment charging Cordova with two counts from Dix's murder. The first count charged VICAR murder, under 18 U.S.C. § 1959(a)(1)–(2). The indictment

---

[1] SNM formed in the early 1980s after a violent and deadly New Mexico state-prison riot. SNM controls narcotics trafficking and other illegal activities within the New Mexico prisons and significant street-level operations outside them.

2

alleged that "as consideration for a promise and agreement to pay[] anything of pecuniary value from [SNM], an enterprise engaged in racketeering activity," Cordova murdered Dix. The second count charged that Cordova had used and carried a firearm during and in relation to a crime of violence (VICAR murder), which resulted in Dix's death, under 18 U.S.C. §§ 924(c), 924(j)(1).

## I.    Trial

We summarize the government's theory of the case as this: In 2004, Dix shot SNM-member Christopher Garcia in a dispute over a woman. In 2005, Garcia, on behalf of SNM, retaliated by hiring Cordova, who acted as Garcia's "runner,"[2] and SNM-member Mario Montoya to murder Dix. In exchange, Garcia, acting on behalf of SNM, agreed to compensate Cordova and Montoya for the Dix murder. Everyone did their part: Cordova and Montoya murdered Dix, and Garcia paid them in drugs and cash.

In proving its case against Cordova at trial, the government presented the testimony of several cooperating witnesses as well as that of FBI Agent Bryan Acee.

In particular, the government relied on Montoya. He testified that Garcia had first approached him to kill Dix. Montoya agreed to do so because he owed Garcia a debt. But Garcia grew impatient with Montoya's delays, so Garcia included Cordova in the murder plans. Armed with guns provided by Garcia, Montoya and Cordova located Dix at a gas station. Cordova approached Dix about buying drugs from Dix.

---

[2] A "runner" does whatever is needed (e.g., transporting drugs, messages, or weapons). The government has never claimed that Cordova was an SNM member.

Dix agreed to sell some, saying he'd get the drugs and meet them back at the gas station. As Dix drove off in his van, Cordova told Montoya that he knew where Dix was headed. So with Montoya driving and Cordova directing, they drove to Dix's location. When they saw Dix drive his van out of an alley, Cordova fired multiple shots into the van, killing Dix. He then told Montoya to drive on. As they crossed the Rio Grande River, Cordova told Montoya to stop the car, and Cordova threw the guns into the river. Soon after the murder, Garcia gave Montoya cash and drugs in exchange for killing Dix. And that same evening, Montoya saw Garcia pay Cordova cash and drugs.

Among other testimony, FBI Agent Bryan Acee recounted his unscheduled interview with Cordova. On redirect examination, Agent Acee testified that Cordova had appeared surprised after being told that Montoya was cooperating with law enforcement on the Dix murder investigation. Agent Acee further testified that he had been surprised that Cordova did not deny involvement in Dix's murder. Cordova's silence, Agent Acee testified, was important evidence implicating Cordova in Dix's murder.[3]

---

[3] We see nothing in the record stating that during the interview Agent Acee had accused Cordova of murdering Dix. Despite that, the government argued in closing that Cordova's silence amounted to the "most important corroboration in this case," characterizing it as "corroboration from the defendant himself." R. vol. 3 at 205.

In his 302 Report,[4] which was provided to Cordova just three weeks before trial, Agent Acee hadn't mentioned Cordova's silence or that he had expressed surprise about Montoya's cooperation in the Dix murder investigation. Even so, Cordova didn't object to Agent Acee's testimony at trial.

The government also played for the jury a one-minute portion of a November 2015 recorded conversation between Montoya and Garcia. The conversation was transmitted from Montoya's body wire and simultaneously recorded. Though the transmission was no better than the recording, Agent Acee listened to it in real time and immediately afterward debriefed Montoya about it. Agent Acee included the contents of the debriefing in a report.

Though the recording was mostly unintelligible, some words stood out—like "Antone," Cordova's nickname, and "jale" (i.e., work, like an assault or murder). Because of the recording's poor quality, Cordova moved before trial to exclude it. The district court denied the motion, ruling that the audible portions of the recording supported Agent Acee's and Montoya's testimony about the conversation and wouldn't unfairly prejudice Cordova. So the government played the recording at trial. And Montoya testified about his recollection of the conversation, as well as the audible portions of the recording. Montoya specifically testified that Garcia had expressed irritation with Cordova ("Antone") for discussing the Dix murder ("jale")

---

[4] A 302 Report memorializes an FBI agent's witness interview. It is filed on the FBI's Interview Report Form FD-302.

with others. Agent Acee testified that Montoya gave the same account to him during their debriefing.

The jury convicted Cordova on both counts. Most relevant here, by special verdict, it found that, as an element of VICAR murder, Cordova's "general purpose in committing murder was as consideration for a promise or agreement to pay anything of pecuniary value from the charged enterprise." R. vol. 1 at 287.[5] The district court sentenced Cordova to the statutory minimum term of life in prison (because the government did not seek the death penalty).

## II.    Cordova's First Motion for New Trial

Cordova moved for a new trial under Federal Rule of Criminal Procedure 33(a) on two grounds. First, he challenged the credibility and sufficiency of the evidence connecting him to the SNM enterprise. Second, he contended that the government had twice violated its disclosure obligations under Federal Rule of Criminal Procedure Rule 16, *Brady v. Maryland,* 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972): (1) by its delayed disclosure of Agent Acee's 302 Report on his unscheduled interview with Cordova, and (2) by its failure to include the agent's observations during the interview, i.e., Cordova not denying involvement in Dix's murder and his surprise that Montoya was cooperating in the investigation.

---

[5] The indictment also charged that Cordova had murdered Dix "for the purpose of gaining entrance to and maintaining and increasing position in" SNM. R. vol. 1 at 116; *see also* 18 U.S.C. § 1959(a). The jury found that the government hadn't proven this alternative method of satisfying the statute's purpose requirement.

The district court denied the motion. It agreed that the government had violated Rule 16 by not timely disclosing the 302 Report as well as Cordova's observed reactions during the unscheduled interview.[6] The district court explained that disclosure of Cordova's silence was necessary because the government characterized it as direct, substantive corroboration of his guilt. But the court concluded that, given the weight of the evidence, the violations were harmless because earlier disclosure wouldn't have changed the verdict. The court also ruled that Cordova had failed to show a *Brady/Giglio* violation, because the excluded information from the 302 Report was not material.

## III.   Cordova's Second Motion for New Trial

Before Cordova's trial, Garcia declined to cooperate with the government and invoked his Fifth Amendment right to not testify. But after Cordova's trial, and before his own sentencing, Garcia interviewed with the government in an effort to secure prison placement in a gang-dropout yard. During his first interview, Garcia admitted to having asked Montoya to murder Dix. But he denied ever asking *Cordova* to murder Dix or even having spoken to him about the Dix murder. But during a second interview three weeks later, Garcia recalled that after Dix's murder, Cordova would remind him that he "did that thing" for him, leading Garcia to give him free or reduced-priced drugs. R. vol. 2 at 427. Garcia said that he understood "that thing" to be Dix's murder. He also confirmed that during the recorded conversation between

---

[6] We do not resolve whether Cordova's silence constitutes an "oral statement" as contemplated by Federal Rule of Criminal Procedure 16(a)(1)(A).

himself and Montoya, he had told Montoya that Cordova shouldn't be talking to others about the Dix murder.

After the government timely disclosed Garcia's statements, Cordova filed a second motion for new trial. In the motion, Cordova argued that Garcia's statements were newly discovered and material evidence that would likely result in an acquittal. He also argued that Garcia could not invoke his Fifth Amendment rights at a new trial given the lack of risk of self-incrimination, and that even if he could, the government could immunize Garcia, and the statements could be admitted under the statement-against-interest hearsay exception. And Cordova asserted that after granting a new trial, the district court should enter a judgment of acquittal if the government refused to immunize Garcia. To refuse to immunize Garcia, Cordova contended, would violate Cordova's due process rights.

The district court denied Cordova's motion, concluding that the statements would be "merely impeaching" of Montoya, immaterial, and unlikely to produce an acquittal. It also concluded that the statements would be inadmissible hearsay, that Garcia could likely invoke his Fifth Amendment right not to testify, and that the government wouldn't violate Cordova's due process rights by refusing to immunize Garcia.

## DISCUSSION

Cordova raises three claims on appeal. First, he argues that the district court erred in denying his first motion for new trial, which he based on (1) insufficient evidence in support of the VICAR murder charge and (2) his assertions that the

8

government violated its disclosure obligations. Second, he argues that the district court erred in denying his second motion for a new trial, which he based on newly discovered evidence. And third, he argues that the district court erred in admitting the recording of Garcia and Montoya's November 2015 conversation. We reject each of Cordova's arguments in turn and affirm.

## I.     First Motion for New Trial

### a.  Sufficiency of the Evidence

We review de novo the sufficiency of the evidence supporting a guilty verdict. *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015). We will not weigh witness credibility or conflicting evidence as those are tasks left to the province of the jury. *Id.* Rather, we ask "only whether, taking the evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Baldridge*, 559 F.3d 1126, 1134 (10th Cir. 2009) (citation omitted). But even under this deferential standard, we will reverse "if the evidence does no more than raise a mere suspicion of guilt or requires piling inference upon inference to conclude the defendant is guilty." *Dewberry*, 790 F.3d at 1028 (citation omitted).

To establish that Cordova committed a VICAR murder under 18 U.S.C. § 1959(a)(1), the government had to prove four elements: (1) SNM was an "enterprise" under 18 U.S.C. § 1959(b)(2); (2) SNM was engaged in "racketeering activity" under 18 U.S.C. § 1961(1); (3) Cordova murdered Dix; and (4) Cordova murdered Dix "as

consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity." The jury instructions specified that for the fourth element, the government needed to prove "that the promise or agreement was made by an individual [here, Garcia] acting on behalf of the enterprise [here, SNM] and not acting *solely* in his personal capacity." Supp. R. vol. 1 at 1655 (emphasis added).

Cordova challenges the sufficiency of the evidence for only the fourth element. He does so in two distinct ways. First, he argues that the government failed to show an actual agreement between Cordova and Garcia to kill Dix. Second, he argues that even if an agreement existed, the government failed to show that Garcia made the agreement on behalf of SNM and paid Cordova on behalf of SNM, rather than as a personal vendetta against Dix for Dix's shooting him in a dispute over a woman. Overall, Cordova argues that the government's evidence in support of the fourth element failed to allow the jury to make its required reasonable inferences. Instead, Cordova contends, the jury was left to speculate and fill in the gaps by piling inference on inference.

We disagree. The line between reasonable inferences and speculation may often be difficult to define, but not here. We begin with Cordova's first challenge to the fourth element. The government presented sufficient circumstantial evidence at trial from which a jury could find beyond a reasonable doubt that Cordova had made an agreement with Garcia to murder Dix. That evidence included the following:

- Four SNM members, including Montoya, testified that Garcia solicited them to murder Dix, offering them money, drugs, and debt forgiveness.

- Montoya testified that "everyone" likely knew that Garcia wanted Dix dead.

- Montoya testified that Cordova was Garcia's "runner," someone who would do what he, and by extension SNM, needed done.

- Montoya testified that while he, Cordova, and Garcia were together, Garcia told him and Cordova to handle shooting Dix together.

- Montoya testified that Garcia gave him and Cordova guns for the Dix murder.

- Montoya testified that on the same night that Garcia paid Montoya for the murder of Dix, he saw Garcia give Cordova cash and drugs.

- Montoya testified that Cordova told him that he got rid of the car they used to follow and murder Dix (allegedly Cordova's girlfriend's or wife's car) so it couldn't be used as evidence in the future. Garcia bought him a Suburban truck as a replacement vehicle.

- An FBI Agent testified that one of Cordova's recorded jail calls revealed that Cordova owned a Suburban.

- A former SNM associate, Gallegos, testified that Cordova told him that Garcia had paid him with heroin for murdering Dix.

Based on this circumstantial evidence viewed in the light most favorable to the government, we conclude that a reasonable jury making reasonable inferences could find that Garcia made an agreement with Cordova to murder Dix in exchange for cash and drugs. This is so even absent evidence of an express agreement between Garcia and Cordova. *See United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000) (noting that an "agreement may be informal and may be inferred entirely from circumstantial evidence"). Further, on appeal, we neither reweigh the evidence nor

11

redetermine the credibility of the witnesses. *See United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008).

Next, we turn to Cordova's second challenge to the fourth element. We similarly conclude that the government presented sufficient evidence from which a jury could find beyond a reasonable doubt that in making the agreement with Cordova, Garcia acted on behalf of SNM. Among that evidence was the following:

- An SNM member testified that SNM "greenlighted" the murder of Dix, first in 2001 for speaking against SNM, and again in 2004 for shooting Garcia.

- Former and current SNM members described SNM's retaliation policy—that to maintain respect from outsiders SNM members must retaliate when threatened, or else face discipline from SNM.

- Garcia approached only SNM members, including Montoya, and a close SNM associate, Cordova, to murder Dix.

- Montoya testified that Dix's murder reflected Cordova's loyalty to SNM.

Based on this circumstantial evidence viewed in the light most favorable to the government, the jury could reasonably infer that Garcia's murder-for-hire agreement with Cordova was on SNM's behalf. It doesn't matter whether personal reasons may have *also* motivated Garcia to murder Dix. *See United States v. Kamahele*, 748 F.3d 984, 1008 (10th Cir. 2014).

In sum, sufficient evidence established beyond a reasonable doubt the fourth element of a VICAR murder. Thus, the jury reasonably found Cordova guilty of a VICAR murder. This is not a case in which the evidence raised no more than a "mere suspicion of guilt" or required "piling inference upon inference to conclude" Cordova

12

is guilty. *Dewberry*, 790 F.3d at 1028 (citation omitted). We therefore reject

Cordova's sufficiency-of-evidence claim and conclude that the district court properly

rejected his first motion for new trial on that ground.

### b. Government Misconduct

We move next to Cordova's argument that the district court erred in holding

that the government's failure to disclose Agent Acee's impressions of Cordova's

reactions during their interview was not prejudicial and did not warrant a new trial.[7]

Cordova insists he needed time before trial to file unspecified pretrial motions, better

impeach Agent Acee, and challenge the murder investigation generally.

The parties agree that we generally review de novo a district court's ruling on

a *Brady/Giglio* claim used to support a motion for new trial. *United States v.*

*Ahrensfield*, 698 F.3d 1310, 1319 (10th Cir. 2012). But the government contends that

Cordova failed to properly preserve the issue, meaning he must satisfy plain-error

review. That said, we need not resolve the standard of review, because Cordova's

claim fails under either de novo or plain-error review. We will briefly explain why.

A defendant seeking a new trial based on a *Brady/Giglio* violation must show

by a preponderance of the evidence that "(1) the prosecution suppressed evidence, (2)

the evidence was favorable to the defendant, and (3) the evidence was material." *Id.*

(quotations omitted). Evidence is material "when there is a reasonable probability

that, had the evidence been disclosed, the result of the proceeding would have been

---

[7] On appeal, Cordova does not argue that the district court erred in failing to grant a new trial given the government's late disclosure of Agent Acee's 302 Report. We therefore do not address it.

different." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (citation omitted). And a "reasonable probability" means "that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Id.* (cleaned up).

Even assuming the first and second prongs are met, the third prong is not. As discussed above, the witness testimony presented by the government against Cordova was substantial. Agent Acee's testimony about Cordova's reactions during his interview a month before his arrest was not a crucial part of the government's case. And we are satisfied that Cordova's re-cross and impeachment of Agent Acee weakened the testimony.

Thus, in the end, none of Cordova's arguments shake our confidence in the guilty verdict. And because they don't, the evidence isn't material, and Cordova is not entitled to a new trial based on the *Brady/Giglio* claim.[8]

## II.    Second Motion for New Trial

Next, we address Cordova's argument that the district court erred in denying his second motion for new trial, which rested on Garcia's post-trial interviews—specifically his statement that "he never asked" Cordova to murder Dix.

We review for an abuse of discretion the denial of a request for a new trial based on newly discovered evidence. *United States v. McCullough*, 457 F.3d 1150,

---

[8] We are uncertain from Cordova's briefing whether he is arguing that the district court erred in concluding that the government's Rule 16 error was harmless. He simply recites the district court's ruling on the Rule 16 issue. If Cordova is arguing that he is entitled to a new trial based on the alleged Rule 16 violation, we would reject that argument for the same reason we reject his *Brady/Giglio* claim: the violation does not undermine our confidence in the outcome of the trial.

1167 (10th Cir. 2006). An abuse of discretion occurs when the district court's decision is "arbitrary, capricious, whimsical, or manifestly unreasonable." *Id.* (citations omitted).

To receive a new trial based on newly discovered evidence, a defendant must show that:

> (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id.* (quoting *United States v. LaVallee*, 439 F.3d 670, 700 (10th Cir. 2006)).

We afford the district court broad discretion in determining whether newly discovered evidence would have influenced the jury. *United States v. Jordan*, 806 F.3d 1244, 1252 (10th Cir. 2015). And generally, motions for a new trial based on newly discovered evidence are disfavored and granted "only with great caution." *McCullough*, 457 F.3d at 1167 (citations omitted).

Here, the district court concluded that Cordova had met prongs one, two, and four, but failed to satisfy prongs three and five. Because we agree that Cordova failed to show that the newly discovered evidence would have probably produced an acquittal at a new trial, our analysis begins and ends with prong five.[9]

---

[9] The parties devoted much of their briefing to Garcia's future hypothetical invocation of his Fifth Amendment right not to testify, whether the government should be compelled to immunize Garcia, and the admissibility of Garcia's debrief statements. But, even accepting Cordova's position on those issues, he would still fail to meet his burden on the fifth prong, so we will not opine on them.

15

Cordova argues in two conclusory paragraphs that prong five is met. This is so, he contends, because "a statement by the only other party to the alleged 'murder-for-hire' arrangement directly contradicting its existence is 'extremely probative' of Cordova's innocence, and would likely produce an acquittal due to the paucity of evidence the Government relied upon here." Opening Br. at 35. This argument fails for three primary reasons.

First, Cordova once again ignores the government's other circumstantial, yet substantial, evidence. As discussed, that evidence demonstrated an agreement between Garcia and Cordova to commit Dix's murder. And given that evidence, we are confident that even if Garcia's statements were admitted at a new trial, an acquittal would be unlikely.

Second, Cordova also fails to factor the incriminating statements Garcia made in his second interview. For instance, Garcia stated that when Cordova would purchase drugs from him, Cordova would make comments like "remember, I did that thing for you," which led Garcia, understanding Cordova to be referring to Dix's murder, to give Cordova drugs for a reduced price or for free. And when asked about the poorly recorded conversation between himself and Montoya, Garcia confirmed that he was telling Montoya about how Cordova had been ill-advisedly discussing the Dix murder with others. Such statements certainly undermine the value of Garcia's statement that "he never asked" Cordova to murder Dix.

Third, Cordova overestimates the probative value of Garcia's statement that he never asked Cordova to murder Dix. He characterizes that statement as one that

16

"directly negate[s] an essential element of the VICAR charge"—i.e., the agreement between Cordova and Garcia. But the government can prove an agreement between Garcia and Cordova to commit a VICAR murder with the testimony of others with knowledge as well as circumstantial evidence. *See Whitney*, 229 F.3d at 1301. Here, as discussed, abundant circumstantial evidence supported the necessary agreement. *See id*.

In sum, because Cordova failed to meet his burden on the fifth prong of the test for procuring a new trial based on newly discovered evidence, the district court didn't abuse its discretion in denying Cordova's second motion for a new trial.

## III.    Admission of the Recording

Finally, Cordova argues that the district court abused its discretion by admitting into evidence the largely unintelligible one-minute portion of the recording of Montoya and Garcia's conversation as well as Montoya's recollections of the conversation.

We review a district court's admission of evidence for abuse of discretion. *United States v. Smith*, 534 F.3d 1211, 1218 (10th Cir. 2008). "Because evidentiary rulings are within the sound discretion of the district court, this court will reverse only upon a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Chavez*, 976 F.3d 1178, 1193 (10th Cir. 2020) (cleaned up). We will not disturb a defendant's conviction based on erroneous admission of evidence if the error is harmless. *United States v. Bornfield*, 145 F.3d 1123, 1131 (10th Cir. 1998).

17

"An erroneous admission of evidence is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *Id.* (quotations and citations omitted).

Recordings objected to as unintelligible may be admitted unless the unintelligible portions render the recording untrustworthy. *United States v. Davis*, 780 F.2d 838, 846 (10th Cir. 1985). "Admission is especially appropriate where a witness who heard the statements also testifies and the recording gives independent support to his testimony." *Id.* at 846 (quotations omitted).

Here, the parties agree that the one-minute recording played at trial is mostly unintelligible, save for scattered words, including "Antone" (i.e., Cordova) and "jale" (i.e., work, like an assault or murder). The district court found that the recording's poor quality didn't render the recording inadmissible. It also found that Montoya and Agent Acee could testify to the contents of Garcia and Montoya's conversation, with the intelligible portions of the recording used to support their testimony. This made the recording's admission "especially appropriate." The district court also noted that though the quality of the recording limited its probative value, risk of unfair prejudice did not substantially outweigh that value. This was so, the court reasoned, because the jury would hear the recording itself and Cordova would have ample opportunity to attack the recordings limitations, as well as Montoya's and Agent Acee's testimony. We agree with the district court's reasoning and conclude that it didn't abuse its discretion by admitting the recording or the related testimony.

18

We also conclude that even if the district court erred by admitting the recording into evidence—and it didn't—such error would be harmless given the government's other evidence against Cordova. *See Bornfield*, 145 F.3d at 1131.

## CONCLUSION

For these reasons, we affirm Cordova's convictions, the district court's orders denying Cordova's motions for a new trial, and the district court's evidentiary ruling admitting the recording and related testimony.