FILED
**United States Court of Appeals**
**Tenth Circuit**

**April 13, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JORDAN THOMPSON,

    Defendant - Appellant.

No. 25-3019

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:23-CR-40049-TC-1)**
_____

Kayla Gassmann, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender for the District of Kansas, Kansas City, Kansas, for Defendant-Appellant.

Jared S. Maag, Assistant United States Attorney (Duston J. Slinkard, Acting United States Attorney, with him on the brief), Office of the United States Attorney for the District of Kansas, Topeka, Kansas, for Plaintiff-Appellee.

_____

Before **PHILLIPS**, **EBEL**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

Jordan Thompson entered the military housing of his estranged wife, Jessica Haraughty, with a gun in hand and the goal of retrieving his three-year-old daughter. Inside, he found Haraughty on the couch with another service member, Joesph

Libbrecht, prompting Thompson to threaten to shoot Libbrecht if he did not "get the f*** out of the house." R. Vol. I at 490. Based on these events, Thompson was charged with three felonies and ultimately found guilty by a jury on one count of assault with a dangerous weapon in a special territorial jurisdiction of the United States, in violation of 18 U.S.C. § 113(a)(3).

Thompson now appeals, raising two issues with the district court proceedings. First, he argues that the district court abused its discretion when it denied his motion for a new trial based on evidence he obtained after trial suggesting that Haraughty and Libbrecht colluded to lie before the jury about their relationship. Second, Thompson alleges that the district court plainly erred in selecting a higher sentence based on his position as a police officer.

Before turning to the merits, we must first consider whether the case is moot, since Thompson was released from Bureau of Prisons custody during the pendency of this appeal. Finding the case not moot because of Thompson's continuing term of supervised release, we then reject Thompson's new trial argument based on his lack of diligence in discovering the post-trial evidence. We agree with Thompson, however, that the district court plainly erred when it found that his professional status as a police officer justified an increased sentence. Accordingly, we affirm the district court's denial of the new trial motion but vacate Thompson's sentence and remand for resentencing.

2

**I.**

Jordan Thompson married Jessica Haraughty in December 2021, shortly after Haraughty enlisted in the U.S. Army.  They have one daughter together, P.T., who was born a few months prior to their marriage.

Thompson, Haraughty, and P.T. initially lived together at Fort Cavazos, Texas, but when Haraughty was deployed to Poland in September 2022, Thompson and P.T. moved to Galena, Kansas.  There, Thompson and P.T. lived with Thompson's mother, Melanie Allison.  After returning from deployment, Haraughty transferred to Fort Riley, Kansas, and in May 2023, Thompson and P.T. moved into Haraughty's on-base housing.  They would not all stay under one roof for long, however, as Thompson moved back to Galena in October 2023, where he began working as an officer with the Galena Police Department.  Despite moving out, he retained a key to Haraughty's home.  P.T. split time between Fort Riley and Galena.

Thompson and Haraughty's marriage "can charitably be described as 'rocky;' separations, distrust, alleged infidelity, and threats of divorce permeated the relationship."  Aple. Br. at 3 (citing R. Vol. I at 459, 464–66, 469, 481, 501–02, 507–08, 524, 556, 558).  In particular, Thompson suspected that Haraughty was having an affair with Joseph Libbrecht, a fellow member of the Army whom Haraughty met while stationed at Fort Cavazos.  Libbrecht and Haraughty had exchanged nude photographs with each other, and Haraughty told Thompson that she had sex with Libbrecht.  At trial, however, Haraughty and Libbrecht asserted that the "affair" was a ruse to enable Haraughty to get a divorce and custody of P.T.  They further testified

that Libbrecht was "gay,"[1] and, as a result, their relationship was entirely

"[p]latonic." R. Vol. I at 467–68, 583.

Despite this extreme marital discord, as of November 2023, the couple was

"still trying to work on [their] marriage." *Id.* at 466. Haraughty visited Thompson in

Galena for Veterans Day weekend, and she had plans to make the roughly four-hour

drive out to Galena to spend Thanksgiving together as well. However, following a

fight with Allison over Veterans Day weekend, Haraughty canceled her planned

return trip. Haraughty instead made plans to spend Thanksgiving with Libbrecht, all

the while telling Thompson that she had to work.

On Thanksgiving Day 2023, Thompson and Haraughty exchanged text

messages in which Haraughty claimed to be exhausted after working all day but

indicated that she would call him after making dinner. But Haraughty did not call.

Having heard nothing overnight, Thompson texted Haraughty the next morning that

he would "assume that something is wrong" such as Haraughty having "a seizure or

pass[ing] out since you've done it a lot in the past." Supp. R. Vol. III at 7.

Thompson proceeded to text Haraughty's neighbor and asked him to check in on

Haraughty. When the neighbor knocked on her door, Libbrecht answered and told

the neighbor that Haraughty was asleep upstairs and doing fine. The neighbor

relayed to Thompson that a man had answered Haraughty's door and said she was

---

[1] Libbrecht's claimed sexuality was not disclosed to either Thompson or the government until the night before the first scheduled trial date. Based on this late-breaking information, the district court granted Thompson's motion for a three-month continuance.

4

doing fine. The neighbor also let Thompson know that the military unit in which both Haraughty and the neighbor served had not worked on Thanksgiving Day.

The knowledge that his wife had been lying to him and, in his words, probably "f***ing other men" pushed Thompson into action. *Id.* He called out of his assigned police training that day, and he and Allison started driving to Fort Riley without telling Haraughty. During the drive, Thompson conducted internet searches asking whether, while going through a divorce, he could take his child from his spouse without her stopping him.

At approximately 2:00 p.m., Thompson used his key to enter the front door of Haraughty's house alongside his mother. P.T. ran over and gave Thompson and Allison a hug. Thompson then turned toward the couch on which Haraughty and Libbrecht were sitting, at which point they saw a gun in Thompson's right hand. According to Haraughty and Libbrecht, Thompson proceeded to point the gun either at or in the direction of Libbrecht and told him to "get the f*** out of the house" or he would shoot. *Id.* at 490–91.[2] Haraughty also testified that Thompson pointed the gun at her. Scared by the gun and Thompson's demeanor, Libbrecht indicated that he would leave and went upstairs to grab his belongings. Thompson then demanded that Haraughty get P.T.'s things together and stated that he was upset that she had a random man in the house with his daughter. After arguing for a short while about

---

[2] In a video posted to her Facebook feed prior to trial, and later shown to the jury, Allison claimed that Thompson "never pointed the gun at anyone" but admitted that Thompson told Libbrecht "to get the f*** out of his house before he shot him." Gov't Ex. 17 at 00:25–00:47.

P.T.'s welfare and whether Haraughty was cheating, Haraughty finally packed up P.T.'s things and Thompson and Allison left. Once they were gone, Haraughty called the police, who promptly issued an Amber Alert. Soon thereafter, Thompson was detained at a gas station with Allison and P.T.

Based on this conduct, Thompson was charged with three felonies: (1) assault with a dangerous weapon against Libbrecht in the special territorial jurisdiction of the United States,[3] in violation of 18 U.S.C. § 113(a)(3); (2) assault with a dangerous weapon against Haraughty, in the special territorial jurisdiction of the United States, in violation of 18 U.S.C. § 113(a)(3); and (3) domestic violence against Haraughty in the special territorial jurisdiction of the United States, in violation of 18 U.S.C. § 2261(a)(1).

Thompson took the case to trial, where he primarily contested the assault element of intent to inflict bodily harm. Specifically, Thompson argued that Haraughty and Libbrecht were lying when they testified that he pointed the gun at them. To support this theory, Thompson explored the series of lies that Haraughty and Libbrecht told either to cover up their sexual relationship or as part of a ruse to enrage Thompson—an illustrative example of their bias against Thompson and, presumably, their willingness to falsely accuse him.

Among other instances of alleged deception, Haraughty and Libbrecht were both cross-examined about a text Haraughty sent to Thompson back in 2022, which

---

[3] Fort Riley is a military installation within the special territorial jurisdiction of the United States.

let him know that she was going to hang out with "McPhaul and her wife, Labrecht and his wife" that evening. R. Vol. I at 279; *see also id.* at 520–23, 598–600. When asked about the texts, Haraughty initially said that the reference to Libbrecht's "wife" was a "typo" because Libbrecht was not married at the time. *Id.* at 520–21; *see also id.* at 599–600. But after reviewing the message, she then claimed that "Labrecht and his wife" did not actually refer to Libbrecht, but rather referred to "a whole different person" that she knew at Fort Cavazos. *Id.* at 522. Similarly, Libbrecht testified that he had socialized with McPhaul and her wife before, though not with Haraughty, and that he knew a man named "Labrecht" at Fort Cavazos.

Ultimately, the jury rendered a split verdict: convicting Thompson of the assault count against Libbrecht but acquitting him of the assault and domestic violence counts against Haraughty.

Thompson proceeded to file several post-trial motions, including the motion for new trial at issue on appeal. This motion was based on a post-trial interview with Breann McPhaul—the McPhaul mentioned in the 2022 text exchange discussed above. McPhaul denied ever socializing with Haraughty and claimed to not know anyone named "Libbrecht," "Labrecht," or anything similar while at Fort Cavazos. Specifically, McPhaul described Haraughty and Libbrecht's claims to have socialized with her as "absolutely false." *Id.* at 280. Nevertheless, the district court denied the motion for a new trial because

> Thompson did not argue or show, as required by [*United States v.*] *Cordova*, that the failure to learn of the evidence was not caused by his own lack of diligence, that the evidence is not merely impeaching, that it

7

is material to the principal issues involved in [the assault of Libbrecht], or that it is of such a nature that in a new trial it would probably produce an acquittal.

*Id.* at 859.

At sentencing, the district court announced a twenty-four-month term of incarceration—the bottom end of the guideline range—to be followed by two years of supervised release. This fell between Thompson's request for a year and a day of imprisonment with two years of supervised release and the government's request for twenty-eight months with three years of supervised release. While imposing the sentence, the court expressed some ambivalence about the case's outcome, stating that "I didn't know how it was going to turn out and I was probably just as shocked as you were at the jury verdict, but if—I would've been shocked regardless of what it was," R. Vol. III at 142, and "I'm not sure I reached the same verdict on any of the counts as the jurors did," *id.* at 143. The court noted that Thompson and Haraughty's troubled relationship was a mitigating consideration, before stating:

It's not lost upon me that you were a law enforcement officer and—fairly or unfairly—I think more is expected of you at that time. So that's kind of the basis for why I'm doing what I'm doing.

*Id.* at 144. Further, the court concluded by listing two aggravating factors that justified this sentence: "[B]ringing a firearm onto a federal military installation and being a law enforcement officer and knowing better than engaging in that conduct." *Id.* at 147.

Thompson now appeals.

8

## II.

Before addressing the merits of Thompson's appeal, "we must be satisfied that we have jurisdiction." *United States v. Salazar*, 987 F.3d 1248, 1251 (10th Cir. 2021). Under Article III of the Constitution, a party seeking relief must have "suffered, or be threatened with, an actual injury traceable to the appellee and likely to be redressed by a favorable judicial decision by the appeals court." *United States v. Vera-Flores*, 496 F.3d 1118, 1180 (10th Cir. 2007) (cleaned up). Where judicial relief will not remedy an appellant's injury, "the appellant can no longer satisfy the Article III case or controversy jurisdictional requirement and the appeal is moot." *Id.* (quotation omitted). We address the question of jurisdiction because, according to a Rule 28(j) Letter filed by Thompson's counsel and publicly accessible Bureau of Prisons records, Thompson was released from federal custody during the pendency of this appeal.

We hold that we retain jurisdiction over this appeal because Thompson's release from custody did not moot the case. First, Thompson's new-trial-motion appeal is not moot because it directly challenges his conviction. As a result, if we were to reverse the district court's denial of the motion, we would free Thompson from the "collateral consequences that continue to flow from the existence of the challenged conviction even after the sentence has been served." *United States v. Sandoval-Enrique*, 870 F.3d 1207, 1211 (10th Cir. 2017) (citing *Spencer v. Kemna*, 523 U.S. 1, 8–12 (1998)). And second, with respect to his sentencing challenge, Thompson's "unexpired term of supervised release, which could be reduced by a

9

favorable appellate decision, is sufficient to defeat a claim of mootness." *Salazar*, 987 F.3d at 1252 (quotation omitted); *see also Vera-Flores*, 496 F.3d at 1180 (holding that the case-or-controversy requirement is satisfied by a defendant on supervised release because his "liberty is affected by ongoing obligations to comply with supervised release conditions and restrictions").[4]

## III.

Thompson first challenges the district court's denial of his motion for a new trial. On appeal, we review the denial of a motion for a new trial for abuse of discretion. *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997). Accordingly, we must find that the district court's order was "arbitrary, capricious, whimsical or manifestly unreasonable" or "based . . . on an erroneous view of the law or on a clearly erroneous assessment of the evidence" to reverse. *United States v. Martinez*, 92 F.4th 1213, 1227 (10th Cir. 2024) (quotations omitted).

---

[4] The Rule 28(j) Letter submitted by Thompson's counsel "admit[ted] that . . . [Thompson's sentencing challenge] is now moot due to [ ] Thompson's release." Aplt. 28(j) Letter at 1. As detailed above, we disagree. The cases cited by Thompson's counsel for this proposition arose in the context of post-conviction collateral attacks, not on direct appeal. *See Rhodes v. Judiscak*, 676 F.3d 931, 932 (10th Cir. 2012) (federal prisoner habeas motion under 28 U.S.C. § 2241); *United States v. Zamora*, 791 F. App'x 693, 694 (10th Cir. 2019) (unpublished) (motion to shorten sentence under 28 U.S.C. § 2255). They therefore do not govern this direct appeal by Thompson. *See Salazar*, 987 F.3d at 1252–53 (distinguishing *Rhodes* on the basis that habeas courts, unlike district courts on remand after a successful direct appeal, "lack jurisdiction to shorten a term of supervised release"). We further note that the government did not endorse this mootness argument and chose not to respond to Thompson's 28(j) Letter.

**A.**

The Federal Rules of Criminal Procedure authorize courts to vacate a trial judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Interpreting this provision, we have instructed district courts that a "motion for a new trial is not regarded with favor and should only be granted with great caution." *Sinclair*, 109 F.3d at 1531. However, in evaluating such a motion, the trial court is "free to weigh the evidence and assess witness credibility." *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999) (citing *Tibbs v. Florida*, 457 U.S. 31, 37–38 & n.11 (1982)).

In particular, when a new trial motion is based on newly discovered evidence, we require a defendant to show:

> (1) the evidence was discovered after trial,
> (2) the failure to learn of the evidence was not caused by [his] own lack of diligence,
> (3) the new evidence is not merely impeaching,
> (4) the new evidence is material to the principal issues involved, and
> (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*United States v. Cordova*, 25 F.4th 817, 827 (10th Cir. 2022) (alteration in original).

**B.**

Here, the district court found that Thompson failed to carry his burden with respect to prongs two through five of the new trial standard. Because we agree that Thompson's lack of diligence caused him to fail to unearth this new evidence before trial and he is required to satisfy all the *Cordova* prongs to be entitled to a new trial, our analysis begins and ends with prong two.

11

The diligence requirement serves to "prevent[] defendants from keeping 'an evidentiary trump card in the event of conviction.'" *United States v. LaVallee*, 439 F.3d 670, 701 (10th Cir. 2006) (quoting *Quintanilla*, 193 F.3d at 1147). Accordingly, we do not require a defendant to "exercise the highest degree of diligence possible to locate evidence prior to trial; only 'reasonable diligence' is required." *Id.* (quoting *United States v. Allen*, 554 F.2d 398, 403 (10th Cir. 1977)). This "reasonable diligence" analysis takes into account the defendant's theory of the case and the accessibility of the newly discovered evidence. *See United States v. Gomez-Castro*, 839 F. App'x 238, 251–52 (10th Cir. 2020) (unpublished).[5]

In this case, given that the central thrust of Thompson's defense was to undermine the credibility of Haraughty and Libbrecht, the district court did not abuse its discretion when it found that Thompson's failure to interview McPhaul prior to trial constituted a "lack of diligence." R. Vol. I at 859. As part of his impeachment-centered defense, Thompson affirmatively chose to cross-examine Haraughty and Libbrecht about the veracity of the 2022 texts at issue. We therefore know that Thompson was aware of the existence of McPhaul in advance of trial. Further, we know that Thompson had the investigative resources available to track down McPhaul in short order; after all, the new trial motion containing McPhaul's statements was filed a mere forty-nine days after Haraughty testified. In sum,

---

[5] Although *Gomez-Castro* is unpublished and therefore not precedential, we find its analysis of this issue persuasive and cite it for that purpose. *See* 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").

12

Thompson was aware of, and had the resources to contact, a witness who could either support or further undermine the veracity of text messages that Thompson planned to use during the cross-examinations of the government's key witnesses. Accordingly, the district court's determination that Thompson failed to satisfy prong two of the new trial standard was not an abuse of discretion. *See LaVallee*, 439 F.3d at 701 (holding that there was a lack of "reasonable diligence" by the defendant when he failed to interview a witness before trial when the witness's testimony was known to be relevant to the defense).

Thompson's contention that the testimony of McPhaul was not "possibly [ ] relevant" until after Haraughty's and Libbrecht's testimony, Aplt. Br. at 27, can be similarly rejected. Even before trial, it was clear that McPhaul's testimony would be, at the very least, possibly relevant to Thompson's theory of defense. For example, if McPhaul denied socializing with Haraughty and Libbrecht—as she did—that would further contradict the 2022 text messages and strengthen Thompson's impeachment of Haraughty, regardless of what was said on the stand about "Labrecht." Admittedly, this argument would have some force if Thompson had interviewed McPhaul before trial but did not ask about the potential existence of a third person named "Labrecht," given Thompson's understanding that this was a misspelling of Libbrecht's name. But no such interview occurred. Instead, despite the relevance of McPhaul's testimony, Thompson did not interview her *at all* until after the jury verdict.

13

In sum, Thompson has not met his burden of showing that "the failure to learn of the evidence was not caused by [his] own lack of diligence." *Cordova*, 25 F.4th at 827 (alteration in original). And because a defendant must satisfy all the *Cordova* prongs to be entitled to a new trial, we therefore hold that the district court did not abuse its discretion in denying Thompson's motion for a new trial.

## IV.

Thompson next challenges the district court's reliance on his professional status as a police officer when imposing a higher sentence. Because Thompson did not raise this issue before the district court, we review his argument on appeal under the plain-error standard. *United States v. Ramon*, 958 F.3d 919, 920 (10th Cir. 2020). Under this standard, "we may reverse only if a defendant demonstrates (1) error (2) that is plain, (3) that prejudices his substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Mendiola*, 696 F.3d 1033, 1036 (10th Cir. 2012) (quotation omitted).

The government "concedes that the district court plainly erred by considering the defendant's occupation as a law enforcement officer during the sentencing hearing," thereby satisfying the first two prongs of the plain-error standard. Aple. Br. at 8; *accord United States v. Chandler*, 732 F.3d 434, 439 (5th Cir. 2013) ("[A] defendant's status as a police officer, standing alone, is not a justifiable reason to increase a sentence."); *United States v. Vega-Acosta*, No. 25-3011, 2025 WL 3537376, at *5–6 (10th Cir. Dec. 10, 2025) (unpublished) (noting that socioeconomic status, which "refers to an individual's

14

status in society as determined by *objective* criteria such as education, income, and employment," is "not ordinarily relevant in sentencing determinations" (emphasis in original) (quotations omitted)).[6]  Therefore, we turn our focus to the third and fourth prongs of the plain-error test below.

## A.

The third plain-error prong requires Thompson to demonstrate that the district court's consideration of his professional status as a police officer affected his substantial rights.  *See* Fed. R. Crim. P. 52(b).  To do so, he must establish a "reasonable probability that, but for the error claimed, the result of the proceeding would have been different."  *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1138 (10th Cir. 2017) (en banc) (quotation omitted).  This is a lower standard than

---

[6] We note that, consistent with Sentencing Guideline § 3B1.3, both parties agree that the abuse of a position of trust to facilitate or conceal an offense is a relevant sentencing consideration.  In this case, however, there is no allegation that Thompson abused his position as a police officer as part of the instant offense.

Additionally, we emphasize that it is permissible for a sentencing court to consider a defendant's employment as part of its statutorily required duty to consider a "defendant's 'history and characteristics.'"  *Vega-Acosta*, 2025 WL 3537376, at *5 (quoting 18 U.S.C. § 3553(a)(1)); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background . . . of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *Concepcion v. United States*, 597 U.S. 481, 486 (2022) ("[A] judge at sentencing considers the whole person before him.").  But here, the district court exceeded the scope of a permissible history and characteristics discussion by holding Thompson "to a higher standard" on account of his position as a police officer.  *Chandler*, 732 F.3d at 439; *see also United States v. Barone*, 913 F.2d 46, 50–51 (2d Cir. 1990) (holding that the sentencing court erred by imposing an upward departure on account of the defendant's position as a judge); *United States v. Harrington*, 82 F.3d 83, 87–89 (5th Cir. 1996) (same as to an attorney).

preponderance of the evidence and only requires a "probability sufficient to undermine confidence in the outcome." *Id.* (quotation omitted).

In the sentencing context, we focus on the impact that an alleged error had on the ultimate sentence imposed. Specifically, the defendant has the burden "to show a reasonable probability that he would have received . . . a *lesser* sentence" absent the legal error, though he need not show that, but for the error, his requested sentence would have been selected. *United States v. Ruiz*, 125 F.4th 1342, 1350 n.7 (10th Cir. 2025) (emphasis in original). Further, we have previously held that "the court's emphasis" or "focus[]" on an improper factor at sentencing is sufficient to create a reasonable probability that the defendant's sentence would have been lower had this factor not been considered. *United States v. Cordery*, 656 F.3d 1103, 1108 (10th Cir. 2011); *Mendiola*, 696 F.3d at 1042 (quotation omitted).

Here, Thompson has carried the burden of showing his substantial rights were affected by pointing to the district court's repeated statements justifying the sentence by reference to his position as a police officer. The district court explicitly stated that Thompson's status as "a law enforcement officer" was "the basis for why I'm doing what I'm doing." R. Vol. III at 144. And the court went on to list only two aggravating factors justifying the sentence, including "being a law enforcement officer and knowing better than engaging in that conduct." *Id.* at 147. This is a textbook case of a district court placing "emphasis" and "focus" on a concededly improper sentencing factor.

The government's rebuttal that "the district court was arguably intent on staying within the calculated guideline range" as evidenced by its bottom-of-the-guideline sentence, Aple. Br. at 23, is unpersuasive. The district court weighed Thompson's mitigating circumstances against two identified aggravating factors before settling on twenty-four months' imprisonment and two years of supervised release. Logically, removing one of the aggravating factors from the equation creates at least a "reasonable probability" that a new balancing by the district court would result in a lower sentence. The government's out-of-context quotation of the district court's remark that the mitigating factors present "urge a sentence on the low end of the sentencing guideline range" does not change the analysis. *Id.* at 23–24 (quotation marks omitted) (quoting R. Vol. III at 147). The court made this statement while enumerating and balancing the aggravating and mitigating considerations present in the case and was clearly a relativistic—rather than absolute—statement.

## B.

The government next argues that we should exercise our discretion to not notice error under prong four of the plain-error test. Under this prong, the defendant "must show that the complained-of error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Rosales-Miranda*, 755 F.3d 1253, 1262 (10th Cir. 2014) (cleaned up). This is a discretionary and "demanding standard" that "depends on the facts of a given case." *Id.* (quotation omitted). However, we are not required to find an error that "shock[s] the

17

conscience" or creates a "miscarriage of justice" to notice and correct it. *See Rosales-Mireles v. United States*, 585 U.S. 129, 137–39 (2018).

Consistent with precedent, we decline the government's invitation to look the other way and instead exercise our discretion to notice the sentencing error present in this case. As discussed above, the district court's reliance on Thompson's job as a police officer when crafting its sentence creates a reasonable probability that his sentence is unduly long. And, as then-Judge Gorsuch held, "what reasonable citizen wouldn't bear a rightly diminished view of the judicial process and its integrity if courts refused to correct obvious errors of their own devise that threaten to require individuals to linger longer in federal prison than the law demands?" *United States v. Sabillon-Umana*, 772 F.3d 1328, 1333 (10th Cir. 2014). Moreover, noticing this error is consistent with the Supreme Court's instruction that "[t]he risk of unnecessary deprivation of liberty particularly undermines the fairness, integrity, or public reputation of judicial proceedings" when the error originated with the district court and the error can be corrected with "relative ease" at a "brief" resentencing. *Rosales-Mireles*, 585 U.S. at 140.[7]

---

[7] We acknowledge that our precedents primarily address the harm that an unduly long period of incarceration has on the "fairness, integrity, or public reputation of judicial proceedings." *E.g.*, *Rosales-Miranda*, 755 F.3d at 1262–63. And here, Thompson has already been released from custody and this opinion cannot retroactively shorten his term of imprisonment. Nevertheless, given the substantial restrictions on personal liberty that supervised release can entail, *see Vera-Flores*, 496 F.3d at 1180, we see no reason to treat the "unnecessary deprivation of liberty" imposed by an unduly long term of supervised release any differently, *Rosales-Mireles*, 585 U.S. at 140.

**C.**

Thompson has satisfied all four prongs of the plain-error standard. Accordingly, we find that the district court plainly erred when it determined that Thompson's professional status as a police officer justified an increased sentence.

**V.**

Thompson was convicted of assault with a deadly weapon after entering his estranged wife's military housing and threatening to shoot the man he found therein. His motion for a new trial, premised on evidence discovered after trial, was appropriately denied by the district court given his lack of diligence in obtaining this new evidence. Accordingly, we AFFIRM the district court's denial of Thompson's new trial motion.

On the other hand, the district court's heavy reliance on Thompson's professional status as a police officer when determining his sentence was plainly erroneous. We therefore REMAND the case to the district court with instructions to VACATE Thompson's sentence and resentence him consistent with this opinion. The mandate shall issue forthwith.